Counsel, you may proceed. Thank you, Judge O'Scanlan, and may it please the Court. My name is Neil Katyal on behalf of the Plaintiff TV Networks. I'll watch the clock, but would like to reserve five minutes for rebuttal. Very well. FilmOn now claims that it is a cable system. That claim contradicts the text of the Copyright Act, contradicts its purpose, and contradicts what every judge looking at this question found except the one below. Congress in 1976 enacted a broad property rights provision in Section 101 and a narrow exception to that for cable systems in Section 111. As its name reveals, a cable system is just that, a cable system. It has a specified, defined meaning and a limited purpose. Indeed, Section 111 was the only compulsory license in the entire code for audiovisual works. FilmOn, four decades later, is seeking to convert that mouse hole into an elephant. Their burden is extraordinary. Given deference, given charming Betsy, FilmOn would have to show that the text of the Act unambiguously favors them, a near-impossible task in light of all the judges who have already looked at this question and who have found the text unambiguous the other way, against FilmOn. So there are really three tiebreaker rules that we think, regardless of how you read the text, and we do think the text support us, will counsel in favor of ruling for us. First, this Court should defer to the decades-old view of the Copyright Office that FilmOn and related services don't qualify for a Section 111 license. So I guess you're first saying it's unambiguous and you win. But if we don't agree with you on that, then we'll look to the Copyright Office. But would you say it's Chevron or Skidmore deference? Well, we do think that both are available. We do think Chevron's the best way of looking at this. But let me just start with the preface of your question, Judge Callahan. Our position is that the only way they can win is by showing the text is unambiguously against us. That is, if there's any doubt, we're in the realm of tiebreakers, not just Chevron or Skidmore, but also charming Betsy and also the presumption against compulsory licenses. Now, with respect to deference, I think the Second Circuit and the Eleventh Circuit, with respect to Section 111 specifically, have granted Chevron deference. And we think that that follows very naturally. That's under the assumption that the term is ambiguous, is it not? Correct. Correct. And, you know, so initially we don't think you actually even have to get to the tiebreakers. But we do think that's the easiest path of decision for this Court to the extent that you read the text and you say, hey, it's really possible, as I think FilmOn tries valiantly in its brief to say, you know, other communications channels. Isn't the Internet another communications channel? I'll explain why we think that's wrong. But even if you think there's some doubt and you can read it either way, we think that the unbroken line of decisions is that you've got to, in those tiebreaker situations, give charming Betsy, you've got to give Chevron or Skidmore deference. And then there's one other thing that Judge Collier did in the D.C. District Court, which I think is very important here, and it follows from the S. Greenhorn Farms v. S.B. Judge O'Scanlon, your decision there, in which the Court said if there's a longstanding administrative interpretation of a statute and Congress is aware of the statute, then that is deemed a legislative ratification of the administrative agency's view. And so even if you think in 1976 maybe it meant something else, and, again, we totally disagree, but the fact that Congress has looked at this issue, it's a big, important issue. And time and again the Copyright Office has said Section 111 doesn't have Internet services. The fact they've looked at it, Congress has changed Section 111 specifically in all sorts of ways, including twice just in 2014, but have done nothing with respect to what they're asking for here, Internet-based transmission services. That's very telling. They've been to the Supreme Court before, right? Correct. Not Philmon, but a different service. Yeah. But wasn't the Supreme Court asking questions like, well, can't you just get a license? Well, I'd say several things about that. Number one, the very fact that they've got to rely on... I'm trying to think, like, okay, so you're telling me do this, and let's just assume this is going to go to the Supreme Court and have to define what they would do. And they were asking questions, well, why can't you just get a license? Well... Right. So the very fact that they've got to rely on some oral argument questions I think is very telling because obviously none of that's in the opinion. What is in the opinion, footnote 17 in Aereo, says very specifically, Aereo said not just that the 111 license issue wasn't brief, they said we are disclaiming it, we are not a cable system. So the Supreme Court was not grappling with that set of questions. If you were worried and you said, oh, I'm really worried about being overruled despite all these other cases, I think that Judge O'Scanlan's decision in Seven Sisters says the thing to do in that circumstance with respect to copyright law specifically is to follow the law of other circuits because of the national uniformity principles that are there. But let me say, if this case goes to the Supreme Court, it's very different than Aereo for three reasons. First, most importantly, as I was saying at the outset, Aereo is about Section 101, the broad property rights provision that Congress enacted in 1976 to overrule two Supreme Court decisions. So they gave a whole bundle of property rights to the copyright holders in 1976. They restored them. And then they said, well, wait a minute, there are these cable systems, these small little things that have grown up and relied on the fact that they've been able to publicly perform for years. So they enacted a very limited exception in Section 111, an exception that in the title of 111 says cable systems, in the titles of 111D says it, and then in 111F defines cable system really specifically, and I'll talk about all that in a moment. But the first thing to say is these are arguments for mutually reinforcing. The Supreme Court decision in Aereo adopts the idea of broad property rights in the 76th Act. That's exactly our argument here. And then, of course, there's no deference that was at issue in Aereo. There was no charming Betsy that was issued there. And ultimately, it's a different statute. If you look at Section 101, and maybe we can turn to the text because I know some of your questions were getting at that, we could start with the addendum brief, addendum to our brief at page 2, which is the language of Section 101. And that defines, and that's what it was at issue in Aereo, and that defines the transmit clauses for any device or purpose. And then it goes on to define that, to say now known or later developed. That is exactly the kind of broad technology agnostic reading that the Supreme Court gave in Aereo, that my clients were arguing for in Aereo, absolutely. Now let's contrast that to what's going on in this case, the license that the Supreme Court was asking about in the Aereo case in Section 111. Now, I do have another question, and I don't mean to, you know, since we have limited time. Is the Library of Congress part of Congress? So isn't it? So this is not typical. And I think I've, I'm pretty sure I've given Chevron deference to the Copyright Office before in opinions. But is it possible it's a legislative agency rather than an executive agency? Well, I think the best decision on this is Judge Silberman's opinion in 1988, joined by then-Judge Ginsburg in Cablevision, in which he grapples with that question and says we've got to give Chevron deference. And most notably for you, Judge Callahan, in 1991, when this court gave Chevron deference to the Copyright Office, it cited one case with approval, and that case with approval that it cited was Judge Silberman's opinion in Cablevision. So I think that that ship has sailed with respect to this circuit, as well as many other circuits, the Eleventh Circuit, Second, and so on. If I could, I'd just like to spend a moment on the text of the statute, because I think it's really important. So the definition of cable system is found in Section 111F, and that is at addendum to our brief, pages 11 and 12. And if I could just start maybe with the top of page 12, it's a nice place to just look. That says that the cable system has to transmit such signals or programs, quote, by wires, cables, microwave, or other communications channels to subscribing members of the public. Now, our point is that if you adopt Philmon's interpretation, they have just taken a big X and struck that entire clause that I just read to you, because their interpretation would mean everything is a communications channel, anything that transmits. But, of course, that's what Congress already said in the preceding language at the bottom of page 11. And this is put technically, or the kind of statutory canon we are invoking, is that the Internet is not a communications channel? Correct. For purposes of the 76 Act. Why couldn't it be? Again, Judge O'Scanlan, we certainly think that there's a way, if you just squint at that one word, those three words, other communications channels, it could be, it's certainly within the realm of possibility, but it's just like the Supreme Court's decision in Circuit City, and then I'll go through nine circuit cases that have applied Circuit City. So in Circuit City, it was a very similar thing. The language there, the Arbitration Act exempted contracts of employment of seamen, railroad employees, or any other class of workers. And what every circuit has said, except this one, is every other class of workers. Well, couldn't we read that to mean all workers? No, because Congress bothered to enumerate seamen and transportation-like people. And so the Ninth Circuit said applies to everyone, because any other worker could include any employee, including an employee of Circuit City. And what the Supreme Court said is no, when you have a specific set of words, and then a general other clause afterwards, that general other clause is limited by the specific ones. Judge O'Scanlan, you, in the Covington case in 2006, faced a very similar thing. The language was other evidence. And the other evidence could have been any type of other evidence, including evidence that was substantively barred. But what you said is no, there's some words before that, and, quote, we must interpret this clause with reference to the preceding list, according to the justum generis canon of construction. Every judge on this panel has applied that canon time and again. And so, yes, you could, if you just squint at other communications channels, say it includes the Internet. But to do so is to read the entire clause out of the statute, because then those words do absolutely no work. They're total surplusage. And so that's our first textual argument for why we think not just that the Copyright Office is right, not just that Charming Betsy is right, or legislative acquiescence, Greenhorn Firms, but just if you were just saying what's the best reading of the text, using ordinary rules of statutory construction, we think that favors us. The second point to make, and this is one that Judge Collier pointed out, is that there's other language in the statute all through that limits it geographically, so that the Internet is very, you know, the Internet is not limited to any particular place. It's national, indeed, even international. When you look at the whole text of Section 111, it really reveals a kind of local focus, and indeed the legislative history is all replete with this, but the text itself is. So the whole scheme for payment of royalties all revolves around distant signals, and it's very hard to figure out, as our brief says, what is a distant signal when you're dealing with something national like the Internet. It also says the facility must be located in, quote, any state. It doesn't say somewhere in the United States. It says in any state, again, kind of a local geographic presence. Indeed, the language of 111F, the definition that I was just looking at you, reading to you, in the second sentence, which I didn't read, talks about contiguous communities. Again, that kind of very local flavor that's in the definition itself, the definitional provision of Section 111F, and there's all sorts of other language throughout 111 that refers to communities, such as C4, 111C4, 111C1E, all sorts of places that say that. So I think the idea that the Internet is the communications channel is really in tension with what the statute was getting at, which is kind of local mom-and-pop systems that were limited, as the Copyright Office put it, inherently localized, and the Internet is anything but inherently localized. Now, there's a second answer, Judge O'Scanlan, to your point. There's two other answers to your question about the Internet. One is Congress in 1976 was dealing with cabled systems because they were very heavily, they gave an exception, a narrow one, because they were very heavily regulated by the FCC, including must-carry legislation. And so what Congress was worried about is they said, look, we've had this cable industry and we incur all sorts of substantial investments in laying cable and the like. But, you know, and now we're going to restore property rights to copyright holders, even though they thought, under Fort Knightley and Teleprompter, the two Supreme Court decisions, that they were able to just get this stuff for free. I want to ask you this. What in the definition, since you're talking about cable system, what in the definition of cable system supports your argument that a retransmission service must control its means of retransmission in order to be a cable system? Okay. So the first thing I'd say is you don't even have to get to that question because they are not a communications system, they're not another communications channel, regardless of the reasons we've been talking about. It's got to look like wires and cables and be geographically located, not something international. Now, then the question is, what supports control? And I think that comes from the language of the statute as a whole, which is that the facility must make the secondary transmissions to subscribers. And as Judges Collier and Koukouris have said in looking at that, that suggests that there has to be control from end to end when cable systems launch the program from the head end to the individual subscriber. And I think, you know, the word make does some work there. You know, if I'm making a pizza for you, Judge Callahan, I am making the pizza. I'm not causing it to be made. I'm not, you know, I'm not outsourcing it to be made. I'm doing it. I'm completing it. And particularly when the language here is that the facility must make the transmission to a subscriber, I think that's what Judge Collier and Judge Koukouris have found. Let me ask you this. You've said if it is ambiguous, the way that you win is by deference to Chevron or Skidmore deference. If it is ambiguous, do you have, what would be your theory? Do they have any other theories they can win under? I don't think so. That is to say, once we're in the realm of ambiguity, it's not just Chevron or Skidmore deference. It's also Charming Betsy. It's this Court's decision in Greenhorn Farms about a legislative ratification of an administrative decision, and it's a presumption against compulsory licenses. There are four things going on. They have to run the table and win them all. If I may reserve. Yes, you may, Counsel. Thank you, Your Honors. May it please the Court. My name is Ryan Baker. I represent the defendants, appellees in this case. Three years ago, we were, before this Court, arguing on a different issue. You're representing Philmon, are you not? Correct. The defendants, appellees, yes, Your Honor. Are you the only one that's going to talk? Yes. No, it's only me. Because our docket sheet simply refers to Ariel Killer. Obviously, there are other parties, but I just want to be sure that you're representing Philmon. That's correct. There was a name change. For the clarity, I guess I'll just refer to my clients as Philmon X or Philmon, if that's clear. Three years ago, we were here arguing on a different issue in this case. The law was different then, and the Supreme Court has spoken since then, and now we're arguing about whether or not Philmon is entitled to a Section 111 license. Three years ago, the appellants here argued that we were like a cable company. Today, we agree. We are like a cable company, and we are entitled to a compulsory license under Section 111 of the Copyright Act. Appellant's counsel has pointed to the text of the statute in order to say that somehow Philmon X does not qualify for a license. But in order to make that finding, appellant's counsel has tried to insert requirements into the statute that simply don't exist. There is no requirement under the Section 111F3 definition of cable system that there be any localism or local-to-local retransmission. There is no requirement under that section that there be any control of a transmission path. Congress was aware of the ability to draft language that required control of the transmission path, and it did that. You're arguing that the section is unambiguous. I am, Your Honor. Is that the only way you can win? No, it's not. If, in fact, there's some finding that there's some ambiguity, whether it's with respect to the language or other communications channels, which is broad and should be interpreted in a broad fashion as Congress intended it, a look at the legislative history makes clear that Congress intended, when it drafted this language in 1976, for it to be interpreted in a manner that would include technology that would develop in the future. It's important for the Court to keep in mind that we're talking about an act that was drafted 30, 40 years ago. And in that act, at the time, there was a disruptive technology, and that disruptive technology was what everyone's calling today traditional cable. And traditional cable was an antenna on the hill with a wire that ran from that antenna down to an end user. And that end user could then watch something they might not otherwise see because they were behind the hill, in teleprompter and fortnightly. Today, we have new technologies that have developed over the course of time. One of those technologies is the Internet. And it's undisputed, and in the record it's undisputed, their expert agrees that the Internet consists largely, the physical layer of the Internet consists of wires, cables and microwaves, the very things that are mentioned specifically in Section 111 as being examples of communications channels. Well, take us through that. Counsel? Oh, let me just finish. Go ahead. The statute says it makes secondary transmissions of such signals by wires, cables, microwave. Now, are you suggesting that making secondary transmissions by Internet includes wires, cables, microwave? Is that your argument? I'm arguing that the Internet is another communications channel, is an example of another communications channel. A moment ago, if I understood you correctly, you referred to wires, cables and microwave all being part of your company's system. Is that right? That's correct. And that's correct in two ways, Your Honor. There are obviously wires, cables and microwaves, in this instance wires and cables, that exist actually in the facility that get to the Internet. And then, of course, Philmon has... The wire or the cable or the microwave does not transmit to the subscribing members directly, does it not? So I'm saying two things. First, I'm saying the facility that the court has found, the district court found exists, which receives signals over the air, and then the district court also found that that facility makes secondary transmissions over communications channels. And those findings, by the way, need to be reviewed under the clear error standard, because they're findings of fact. That once those transmissions are made from the facility, they travel over the Internet, and I'm saying that the physical layer of the Internet consists of wires, cables and microwaves, such that it's strange logic to read, to interpret the Internet to not be included within the definition of communications channels. Judge Rawlinson, I'm sorry. I think I interrupted. You were asking a question. That's okay. I was going to ask counsel, what are we to make of the fact that Congress apparently deemed it necessary to enact separate licensing schemes for cable and for microwave? What do we do with that fact? Yes, Your Honor. Thank you. So two things. There were a couple of instances when Congress stepped in and legislated to either clarify or to create, in the case of satellites, a separate regulatory scheme under which compulsory license could be obtained. So going with the first in time, we're talking about the satellite cases. The satellite cases in the 11th Circuit, initially the district court found that satellites, because there was no facility on the Earth that made the secondary transmissions that was in any state or province or territory, that they were not a cable system under Section 111. Congress then enacted the Section 119 compulsory license to deal with satellites, because there was a question as to whether or not they satisfied one of the threshold requirements, which was to have a facility making secondary transmissions in a state, territory, or province, because those transmissions were made from a satellite that was in orbit. The 11th Circuit actually then ruled that, well, it could be in more than one state, so we're going to actually find that there is, in fact, a license that's due here. Then what happened, which is very different, this is very important with regard to the deference point, then what happened is the Copyright Office entered into a formal notice and comment rulemaking, which hasn't happened here. It hasn't happened with regard to the Internet, and in spite of all the arguments otherwise that seem to imply that some sort of Chevron deference is due, there's been no formal rulemaking, so there is no deference that's due. Then what happened is the Copyright Office in that case said no, the satellites are not entitled to 111 license, and the satellites were left with Section 119 and ultimately Section 122. However, in enacting that license, Congress specifically said, and it's stated in our brief and it's in the legislative history, that it wasn't taking a position that just because Section 119 was being enacted that the satellite companies were not also entitled to a license under Section 111. The second instance that Your Honor has mentioned is the microwaves, and this is something that Judge Collier and Judge Koukouris in Illinois have referenced and even IVI referenced just glibly to say, well, in microwaves they had to go get an amendment, so the Internet should do the same. But it's not that simple. When Congress had to respond to, again, another formal notice rulemaking by the Copyright Office, which is absent here, and in fact I will mention briefly, not only is there no formal notice rulemaking here, but Congress has, or the Copyright Office, rather, has actually spoken specifically to Film On X on this issue. And it didn't say, no, you're not entitled, we're rejecting your statements of account, when Film On X submitted its statements of account to the office. The office said, in recognition that the question of eligibility of Internet-based retransmission services for Section 111 appears to have been raised again before the courts, the office will not refuse Film On's filings, but will instead accept them on a provisional basis. So you have the office here in this case. That doesn't prove very much, I'm afraid. Well, what it proves, Your Honor, is that the Copyright Office doesn't know. The Copyright Office is deferring to the courts to wait to see what an independent judicial review will do. So the courts should not say, well, we're just going to do what you said earlier. Speaking of the courts, it appears to me that there are seven different court decisions with respect to Section 111, and this is the outlier. All six of the others, Second Circuit, various district courts, have all concluded the other way. What's your response? Well, those start with IVI. And so IVI is the issue, and I think that the Second Circuit case. So it started in the district court, and the district court's opinion is by far the most expansive in terms of dealing with the facts, and there are some important distinctions. And in fact, it's true that this court doesn't even need to depart from IVI on all fours in order to find for Film On X and affirm the ruling of the district court here. Because in IVI, there were some important differences. Number one, first and foremost, there was no evidence of any physical facility other than the internet. And in fact, the Circuit Court actually says, we're not sure if we're supposed to find that the internet is, in fact, a physical facility. Obviously, we're not arguing that it is, and we don't think that it is a physical facility. What are you relying on for a physical facility? We have a building within each territory or province, within each community, into which we retransmit that receives the signals broadcast over the air by FCC-licensed broadcast stations, and then retransmits those signals to the end-user subscribers. You're saying Film On is more than one facility? It's more than one locality? That's correct. There's actually a physical facility in each of the locations where it was retransmitting to subscribers. Of course, there's no... How many places is that? I believe it was 16, something in that neighborhood. To be honest, I don't remember exactly, Your Honor. But there was a physical facility in each of those areas, and Judge Wu has found, in fact, that Film On X did have physical facilities in the communities into which it was retransmitting. But is that consistent with the statute when it says a cable system is a facility located in a state, et cetera? Yes, Your Honor, I believe it is. Well, in your case, it's multiple facilities. It's a facility within each community into which it retransmits. So I suppose it could be argued, and when we submitted statements of account... So you're not one cable system. You're 16 different cable systems. Is that right? Well, I believe it's possible to interpret it that way, but that's a distinction without a difference, Your Honor, because the important aspect of it is within each community where we transmit, we have the physical facility that both receives and makes the secondary transmissions. Let me just address one other point. Counsel for the appellants argued that somehow because we use the internet as a communications channel that our transmissions go around the world, and they're not localized. Film On X has never had any intention of transmitting outside of its communities and, in fact, has developed technology that was considered by the court in this case that will geo-restrict its retransmissions into the communities in which it receives those signals. So to the extent the court is concerned with some local-to-local or local retransmission issue, which is, mind you, not in Section 111, Film On X does not intend to retransmit over the world. And also the parade of horribles that has been presented by the appellants about this nebulous internet, it needs to be looked at in context. Some of these cases were from the late 90s. The internet's obviously developed significantly since then, and I dare say that everybody in this courtroom engages in confidential transactions on almost a daily basis and utilizes the internet for almost all sorts of business on a daily basis. Lastly, I will say, with respect to that point, each of the plaintiffs, appellants in this case, already offers its content on the internet. Every cable system, traditional cable system that exists today, enables its users to log on via iPad, as your honors all have before you, or other mobile device and watch broadcast television. There is a way to geo-locate. Film On X intends to do that and intends only to transmit within the communities where those signals are received. Going back to IVI, another, so the main issue there was, the distinction, is we have physical facilities, they didn't. The court was grappling with whether or not the internet could be a physical facility. It found that because there was no facility, that some of the language from the copyright office was, in fact, important with the concerns that there would be some local-to-local retransmission, and then the office was also concerned with some of the other FCC's rules and regulations, including a transmission path. But, as I was saying before, the communications channel language that's in Section 111F3 should not be conflated with what's in the Communications Act. Counsel, does that apply also to the district court decisions in the Northern District of Illinois and other Southern District of New York decisions? It certainly applies to the Southern District of New York decisions. How about the District of Columbia? The District of Columbia and the District of Illinois, Your Honor, we believe those cases wrongfully followed IVI down a path and, in fact, expanded the language and the holding of IVI to the effect that it will chill anybody who wants to engage and utilize modern technology on the internet to offer television, broadcast television, and it's important to keep in mind, again, this is something, we're talking about free-to-air television here. This is something that anybody can put an antenna up and receive. All Film On X is trying to do is to make that which Congress has already proclaimed as an important public good more available to consumers on the internet, the way that people do most of their business today. So to exclude that, to expand the ruling on IVI, which was limited to those facts where there was no evidence, to establish a physical facility, just to say that anything on the internet is forbidden is a serious risk to not only innovation, but to the public, to the public's right to access television, free-to-air television. One other follow-up. Are all of those district court decisions examples where there was no facility? Because your main argument about IVI is there was no facility. Certainly that is the case with respect to IVI and its progeny. However, the Film On cases before Judge Koukouras in Illinois and Judge Collier in D.C., we had the same evidence before those courts, and those courts did come out differently, and we disagree with those rulings. We think Judge Wu got it right. Those courts deferred to IVI. They deferred to the Copyright Office on Skidmore grounds, not Chevron grounds, and apparently they found that the Copyright Office's informal proclamations were persuasive. It's important to note, as I mentioned, although the appellants would argue and try to argue that there's been some formal notice in rulemaking that has resulted in a declaration that the internet is unavailable for a cable system, that's simply not true. Those statements at best have come from rulings with respect to microwaves and with respect to satellites. And the last point that I wanted to discuss with regard to microwaves is when Congress actually amended, and Judge Rollins, and this gets back to your question, when Congress amended to add microwave to the statute, it only did that because it had to, because the Copyright Office had done something formal that forced Congress's hand, that essentially, as appellants' counsel said, erased other communications channels from the statute, deprived it of its meaning, because it would not give effect to an example, and Congress said as much. It said that — Congress could just straighten all this out for us, couldn't they? Congress could. Congress could, but it's not necessary. But is it usually just because Congress can't — it could straighten it out for appellants or appellees, but — You're right. They're just not doing anything as usual, or what? Well, I don't know what they're doing, Your Honor, but they're certainly not doing this. And I believe they're not doing this because they've already done it, because they've already drafted language that includes the internet. And that's what they said when they amended with regard to microwaves. They said the 94 Amendment overturns an erroneous interpretation of cable system by the Copyright Office, and they described that as an unnecessarily restrictive interpretation. That's exactly what's happening here. But they've had six different decisions going the other way, and Congress hasn't done anything about it. Well, you know, Congress has acted in these cases usually after the Copyright Office has made a formal decision. And here the Copyright Office is looking to the courts to interpret the plain language of the statute. Because that language is unambiguous, this Court should affirm the ruling of the District Court, which is that Film on X is entitled to a compulsory license because it meets the simple, fundamental requirements within the statute. There is — there's no room for — I always have trouble with unambiguous when you have — if you assume that other judges are entitled to some respect, when other judges have all seen it a different way than — you know, not to say that, you know, that Judge Wu isn't entitled to respect as well, but if different judges keep coming up with different interpretations and keep saying it's unambiguous, but they don't get to the same place — Well, I understand your Honor's concern. You know, and when I listen to Appellant's argument and your argument, and you both make good arguments, that just — you know, in a way, you know, if I were arguing this, I would say, well, that rests my case. You both made good arguments, so it's ambiguous. I understand your Honor's concern, Judge Callahan. And even if there is a finding that there's some ambiguity in the statute, again, a look at the legislative history clarifies that Congress intended this language to include new transmission channels. And that's what happened with the microwave, and even when Congress enacted the satellite, and it said, don't take this to mean that satellites aren't included in 111 also. But microwaves are even more powerful, where Congress says, hey, we're only doing this because the Copyright Office is rejecting every attempt for any new technology. And that's what Judge Wu focused on. There's a historical hostility of the office against any compulsory license to begin with. And in this particular, the office has taken numerous informal opportunities to say that the Internet should not be included. Should that at least be given Skidmore deference? Well, the court — I mean, if they had gone with you on what you're — how you're — if the Copyright Office said the opposite and they were with you, would you — of course, you'd be arguing that they were entitled to Chevron deference,  but, I mean, Skidmore is easier for you to rebut, right? I think it is, Your Honor. Yes. And so Skidmore, obviously, is the power to persuade. And the Copyright Office's historical hostility towards the act deprives its position now of any persuasive power. And furthermore, its acknowledgment in this particular instance that it's not going to take any formal action. I mean, if the Copyright Office was resolute in its stance that nothing on the Internet can be a cable company, well, it probably would have rejected AT&T's request. But it didn't do that. It said AT&T can go ahead and — because it uses IP technology, that's okay. It can go over the Internet. And it wouldn't have received and held on to our filings. It would have rejected those filings. It didn't reject them. It received them. It's looking to this Court for an independent review. Judge Wu gave it an independent review. He found that Philmon X is entitled to a Section 111 license. This Court should do the same. This Court should give meaning to the language of the statute under Section 111 and not allow the insertion of any additional requirements by the appellants. This Court should affirm. Thank you, Your Honor. Your time has expired. Mr. Katyal, you have some reserved time. Judge O'Scanlan, as you were saying, there's a reason why all of these courts have looked at this issue except for the outlier court below and ruled in our favor and found the text against Philmon. The Act, as you were saying, clearly has a narrow exception for transmission by cable systems, not transmission by anyone. And Philmon would gut that narrow exception. Again, suppose you thought — and this goes to your question, Judge Katyal — at the end of the day, maybe you could squint and read those three words to encompass Philmon services. But given deference, given charming Betsy, which I heard no answer to, I think you'd have to rule for us. And given the fact that this is something that the Congress has repeatedly considered — so this isn't a case, Judge Callahan, of Congress doing nothing. This is a case in which Congress has modified this very statute six times in the last few years. They're obviously aware of the Copyright Office's interpretation, which has put in reports to Congress that Congress itself asked the Copyright Office to prepare, and they've done nothing. These folks want you to do the work for them that they should be doing in Congress. Now, my friends — Counsel? Yes, Judge. What's your response to opposing counsel's observation that many of your clients and AT&T broadcast over the Internet? Sure, they do, under licenses, under market conditions and licenses. But they don't have what's a — you know, but the idea of having a compulsory license, which is a forced transaction, and, you know, at — you know, in which you have to do it, is a very different thing. And that's what Congress recognized in 1976. And, Judge Rawlinson, I think that underscores — there's a lot that they just told you, but they left out. And this happened time and again. It happened with this Internet question that you just mentioned. They don't tell you that that's all done because of licenses. My friend says, for example, that IVI was a decision about the physical facility, not in existence in that case. Here's what he doesn't tell you. He doesn't tell you that was a footnote in the decision. He doesn't tell you that the Second Circuit expressly ruled for us that there was other communications channels, the main discussion we were having at the outset. He doesn't tell you that the Second Circuit said the purpose and the legislative history is flatly against Philmon in the case. Then he says, well, look at the 2014 letter that Philmon got and how they accepted the filing on a provisional basis. That's what he tells you. He doesn't tell you that that very letter, which is ER 26, says we very well may reject this. He doesn't tell you that the Copyright Office's longstanding position from 1992 until today has always been that Internet facilities do not qualify for Section 111 licenses. Indeed, even yesterday the Copyright Office sent a letter to Congress reaffirming this position at page 10 of their set box rules. What about his argument about formal rulemaking? Yeah, so these were formal rulemakings in 1992 and 1997 when they decided that it was inherently localized transmission media. And after that, the Copyright Office is just connecting the dots because the Internet is obviously not inherently localized and I don't take my friend on the other side to be disagreeing. And as well, the 2004 and 2008 reports, we do think, are the equivalent of formalized rulemaking. Congress invited those reports. There was express comment periods given. This is all put at the start of the 2004 and 2008 reports. And, of course, under Greenhorn Farms, you know, you won't even necessarily have to get to this because it's in a legislative ratification. My friend told you about the geolocation devices that they supposedly operate and he said, quote, the district court considered this. He doesn't tell you the district court considered it and rejected their argument. That's page 3 of the district court's opinion. These services, these geolocation services, aren't even turned on, that Phil Moen is using. And even if they were turned on, they're not inherently localized. Putting some artificial technological constraint on something doesn't solve the problem, which is what the Copyright Office has said. Judge Rawlinson, my friend on the other side, answered your satellite and microwave question saying Congress wanted to overrule the restrictive interpretation that the Copyright Office had given Section 111. That's not what they did. He doesn't tell you what they did. They enacted very specific, tech-specific changes to Section 111, adding satellites to, excuse me, adding microwaves to 111 and adding an entirely different tech-specific regime for satellites. What he's asking you to do is what Congress did with respect to those specific technologies. Here's what Congress didn't do. In Section 111, they didn't do what they did in Section 101, which is have any device or process, you know, now known or future developed, that kind of tech-agnostic reading that they're saying, you know, is somehow in 111. 111, from start to finish, from title to text, is all about very tech-specific things. Satellites, microwaves, head ends, you know, wires, cables. It's not this open-ended invitation to do anything. I see my time is up. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision.
judges: O'scannlain, Rawlinson, Callahan